[Cite as *Delasoft, Inc. v. Ohio Dept. of Adm. Servs.*, 2020-Ohio-3558.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Delasoft, Inc., | : | |
| Plaintiff-Appellant, | : | |
| | : | No. 19AP-761 |
| v. | : | (C.P.C. No. 19CV-6257) |
| Ohio Department of Administrative Services et al., | : | (REGULAR CALENDAR) |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

D E C I S I O N

Rendered on June 30, 2020

**On brief:** *Graff and McGovern, LPA*, and *Luther L. Liggett, Jr.,* for appellant.

**On brief:** *Dave Yost,* Attorney General, *Keith O'Korn, Hilary Damaser,* and *Lidia Mowad,* for appellee Ohio Department of Administrative Services.

**On brief:** *Dave Yost,* Attorney General, and *L. Martin Cordero,* for appellee Ohio Department of Transportation.

**On brief:** *McDonald Hopkins LLC,* and *Peter D. Welin,* for appellee BEM Systems Inc.

APPEAL from the Franklin County Court of Common Pleas

NELSON, J.

**INTRODUCTION**

{¶ 1} Delasoft, Inc. appeals from the trial court's grant of a motion to dismiss filed by Ohio's Department of Administrative Services ("DAS") on the eve of a preliminary injunction hearing and considered by the trial court upon further briefing after Delasoft had put on its preliminary injunction evidence but before the hearing was concluded. Because the trial court, like DAS, assumed that the goods and services contract at issue is a

"public improvement contract" making the case subject to immediate dismissal as moot once any performance had commenced, but because the trial court did not analyze the nature of the contract to make that assessment and because evidence in the record might be construed to suggest that the contract is more akin to an agreement to sell "off the shelf" products and related services (over what is envisioned as a ten-year period) than to perform construction-type work, we will reverse the judgment of dismissal and remand the matter to the trial court for further proceedings. We are not in a position at this juncture to determine in the first instance the proper characterization of the contract for this purpose, and nothing in this decision should be construed to require any ultimate finding on that issue or as to the weighing of equities for injunctive relief; rather, the record needs to be further developed and elucidated before such determinations can be made.

{¶ 2} The facts that are clear on the record so far, however, are quite remarkable. The record as uncontested at this point suggests that Delasoft, which DAS lawyers identify as "an Asian-Indian contractor," *see* Appellee DAS Brief at 43, lost out on its state contract proposal, despite DAS otherwise having scored it the best bidder, because Delasoft did not promise to shift as much money to a "Minority Business Enterprise" subcontractor as did its ("non-minority," *id.* at 37) competitor BEM Systems, Inc.—which for that purpose invoked ... an "Asian-Indian" firm, *id.* at 43. Further elevating the facts to parable status, DAS seems to have given the nod to BEM on that basis without concern or regard for the fact that BEM's subcontractor Comtech will turn around and pay the lion's share of its subcontractor "MBE Set-Aside Cost Percentage" right back to BEM. *See, e.g.,* September 6, 2019 P.I. Tr. at 183 (BEM E-Business Director Kevin Courtney puts the yet to be negotiated flow-back amount at "somewhere between 80 and 95 percent" of the software license price); *id.* at 93, 94 (DAS Chief Procurement Officer Kelly Sanders testifies that DAS scored what BEM would pay to subcontractor Comtech but did not inquire into what Comtech would pay back to BEM: "I don't know what their arrangement would be"); *id.* at 213 (Comtech President Nannapaneni testifies that subcontractor has no contract with BEM to receive any fixed minimum dollar amount and is still negotiating "how much it will cost Comtech * * * to pay BEM for the license"); *see also* bid scoresheet recap in Delasoft Exhibit E. at 1.

{¶ 3} Delasoft complains that the whole circuitous arrangement is not authorized by any Ohio law and boils down to government race-based classification that is illegal under longstanding federal court precedent, *see* Complaint at ¶ 13-15 and *Associated Gen. Contrs. of Ohio, Inc. v. Drabik*, 214 F.3d 730 (6th Cir.2000). DAS counters, among other things, that it is owed "deference in interpreting its [sic] statutes," and that the illegal construction contracting in *Drabik* arose under statutory provisions different from the purchasing provisions that DAS says authorize its conduct here and that the Supreme Court of Ohio had upheld before *Drabik* was decided. *See* Appellee DAS brief at 33, 37. The central question for us now, however, is whether the trial court erred in dismissing Delasoft's lawsuit for lack of subject-matter jurisdiction because moot as filed too late to permit any injunctive or declaratory relief under any possible merits decision and weighing of the (timing and other) equities.

{¶ 4} At least for purposes of *that* analysis, DAS seems to suggest, the contract at issue here should be viewed as rather in the nature of a construction contract: "Notably," DAS argues, "Ohio precedent looks merely at whether 'construction commences' and not at the percentage of completion of the total contract as Delasoft advocates." DAS Brief at 23-24, citing *Colosseo USA, Inc. v. Univ. of Cincinnati*, 1st Dist. No. C-180223, 2019-Ohio-2026, ¶ 19, quoting *State ex rel. Gaylor, Inc. v. Goodenow*, 125 Ohio St.3d 407, 2010-Ohio-1844, ¶ 11 (a public-works construction contract case), and further invoking (1) *Meccon v. Univ. of Akron*, 126 Ohio St.3d 231, 2010-Ohio-3297 (a case involving plumbing and HVAC contracts for "public-improvement work," *see id.* at ¶ 2, and noting that, "[u]nder our precedent, once the public-improvement work commences, or is completed," injunctive relief will not be available, *id.* at ¶ 12, 13); (2) *Control Data Corp. v. Controlling Bd.*, 16 Ohio App.3d 30 (10th Dist.1983) (a computer-related case in which "a justiciable controversy exist[ed]" and that proceeded to trial on its merits before the courts found that the state had substantially complied with bidding requirements); and (3) *Cementech, Inc. v. Fairlawn*, 109 Ohio St.3d 475, 2006-Ohio-2991, ¶ 13 (involving a "service-road project [that] proceeded and was completed").

{¶ 5} But as to whether the contract here fits this construction/public-improvement work category, the facts are not so clear and, absent a more focused trial court record, we are loathe to extend to long-term procurement contracts the contract

commencement rule that *Meccon* carefully applied to "public improvement work." As in *Modern Office Methods, Inc. v. Ohio State Univ.*, 10th Dist. No. 11AP-1012, 2012-Ohio-3587, ¶ 23, it may be that "the instant case does not involve a state public-improvement project subject to competitive bidding laws like in *Meccon*, but rather a contract * * * for goods and services established using the RFP process. * * * * This differentiates the instant case from *Meccon*." *See also Empower Aviation, LLC v. Butler Co. Bd. of Commrs.*, 185 Ohio App.3d 477, 2009-Ohio-6331, ¶ 25 (1st Dist.) (finding denial of preliminary injunction not to be a final appealable order where possibility of injunctive remedy could extend beyond start of contract performance because "[t]he contract at issue here involves a contract for services, not construction, and the term of the contract is lengthy – a five year minimum. This demonstrates that an appeal after a judgment on the merits would not prevent a meaningful or effective remedy").

**THE RECORD TO DATE**

{¶ 6} To put the issue in context, we turn to a closer examination of the record as it now stands.

{¶ 7} The controversy began with a Request for Proposals ("RFP") issued by DAS on behalf of the state Department of Transportation ("DOT"). "The objective of this Request for Proposal opportunity," DAS recited, "is to find a commercial off the shelf (COTS) system (or develop an online web-based permitting system if an existing software application cannot be found) that can meet [DOT's] twofold needs: 1) to purchase a web-based permitting system [meeting DOT's requirements for organizing right-of-way permits]. And 2) to provide a web-based Outdoor Advertising Control System to support the permitting process for signs and billboards * * *." RFP, Delasoft P.I. Exhibit C at 3. "The goal is to find and implement an online permitting/outdoor advertising system to provide a seamless uniform process for both external customers and internal ODOT users." *Id.* DAS made clear that "existing software application is preferred over application development * * *." *Id.* DAS envisioned a deal involving computer software licensing and service that would run over a ten-year period. P.I. Tr. at 109-10, 118 (DAS's Ms. Sanders). More technically, the RFP specified that "[o]nce awarded, the term of the Contract will be from the award date through June 30, 2019. The State may renew this Contract for up to five (5) additional two-year term(s), subject to and contingent on the discretionary decision

of the Ohio General Assembly to appropriate funds for this Contract in each new biennium." RFP at 2, 13.

{¶ 8}   The RFP recited that it was issued "under Sections 125.071 and 125.18 of the Ohio Revised Code," relating to what the Code captions "purchases by competitive sealed proposal" and to matters involving information technology, as well as pursuant to Administrative Code section 123:5-1-8 (concerning the RFP process for the "purchase [of] products, supplies, and/or services"). RFP at 2. It did not cite as authority any code section within Chapter 153 ("Public Improvements").

{¶ 9}   The RFP was "not [an] MBE [Minority Business Enterprise] set-aside contract," and any qualified bidders were welcome. *See* Tr. at 63-64 (DAS's Sanders). Indeed, contract awardee BEM is not an MBE. *Id.* at 63. The RFP did, however, include an "MBE Subcontractor Plan." RFP at 21. As initially expressed, that language read: "The offeror's proposal must include an Ohio certified MBE subcontractor plan (Plan). The Plan must (a) state the specific percentage of the cost of the Work that it will set aside for Ohio certified MBE subcontractors [only which must equal, at a minimum, 15% of the cost of the contract]; (b) include a description of a competitive process to be used for the selection of Ohio certified MBE subcontractors to which only Ohio certified MBEs may respond; and (c) identify proposed portions of the Work to be performed by Ohio certified MBE subcontractors." RFP at 21. Although the bracketed language later was deleted by amendment, the rest was retained. Sanders Affidavit at ¶ 3, Exhibit A to August 16, 2019 DAS Memo in Opp. and *id.*, Exhibit 1. The RFP underscored that MBE status of a prime contractor would not count: "For this RFP Ohio certified MBE's that are the prime must subcontract with an Ohio-certified MBE to meet the * * * requirement." RFP at 18. And "the State included in the Evaluation Scoring Formula of this RFP, a provision for the offeror to seek and set aside work for MBE subcontractors. The State encourages 15% of the work to be Set-aside." *Id.* at 17.

{¶ 10}  The RFP's scoring metrics allocated 600 points to the best technical proposal, on standards outlined in some detail, and with other bidders to receive less than that based on a formula. The bidder offering the lowest cost was to receive another 250 points, with others getting less than that based on another formula. The RFP further recited that: "The offeror with the highest proposed MBE Set-aside Cost percentage will receive 150 points

* * *.  The remaining offerors will receive a percentage of the maximum MBE Set-aside points available based upon the following formula:  MBE Set-aside Points = (Highest MBE Set-aside Cost Percentage/Offeror's MBE Set-aside Cost Percentage) x 150."  RFP at 16 (mistakenly switching the numerator and denominator, DAS says, *see* Appellee DAS Brief at 9, n. 1, adding that calculations were done "properly").  The "Total Points Score" for the bids was then to be calculated as "Total Points = Technical Proposal Points + Cost Summary Points + MBE Set-aside Points."  RFP at 16.  DAS says that the allocation of points among these components was "ultimately the agency's [DOT's] decision.  * * * [W]e at DAS work collaboratively with the client agency to determine what is most important to them and how they see those components and what components make[ ]up the total score."  Tr. at 70 (DAS's Sanders), *see also id.* at 71-72 (DAS not aware of how DOT established the scoring ratios).

{¶ 11} In the event, only Delasoft and BEM—*each* of which offered an "MBE Subcontractor Plan"—qualified to have their bids scored; no other entity met the "mandatory criteria."  Tr. at 66 (Sanders).  We do not find in the record any indication of whether other bidders were eliminated from consideration for failure to provide the required "certified MBE subcontractor plan."  Delasoft graded higher on its technical proposal, garnering 600 points to BEM's 511.  Sanders Affidavit at ¶ 10 and Delasoft P.I. Exhibit E at 1 (bid scoring summary).  BEM came in with a lower cost cap ($1,640,000 as compared to $2,161,657), and thus was awarded 250 cost points to Delasoft's 190.  *Id.* Therefore, without regard to the "MBE Subcontractor Plan" score, Delasoft edged out BEM by a composite score of 790 to 761.  *See* Tr. at 103 (DAS's Sanders:  Q. "[B]ut for the MBE component, Delasoft scored higher, correct?" A. "Based on the addition of those two numbers, it is a higher score.")  But BEM designated 54% of its bid price for Comtech, "as BEM's subcontracted MBE vendor," P.I. Exhibit D at 16 (BEM proposal), while Delasoft proposed a "17% MBE set-aside cost percentage."  Sanders Affidavit at ¶ 12; *see also* P.I. Exhibit E at 1.  BEM therefore received the 150 maximum points for that scoring component, while Delasoft got another 47 points.  Sanders Affidavit at ¶ 13; P.I. Exhibit E at 1.  Those points meant that BEM wound up with a total score of 911 points, compared to Delasoft's 837.  The as-yet uncontested premise of Delasoft's lawsuit is that BEM was awarded the contract on that basis.  Complaint at ¶ 49; *see also* Tr. at 104 (Sanders: BEM was high scorer "[b]ased on two of three components").

{¶ 12} BEM's winning submission pitched its PAECETrak software system. BEM bid, P.I. Exhibit D. BEM made clear that it "normally does not use subcontracting to complete PAECETrak-related deployment projects," but said that it "has used MBE subcontracting for other types of projects in its consulting work since [the company's] inception." *Id.* at 3. For this project, BEM said, "[t]he total participation rate for Comtech as BEM's subcontracted MBE vendor will be 54% as detailed in the cost section of BEM's proposal." *Id.* at 16. BEM explained that Comtech is to act as a "Value-Added Reseller (VAR) * * * for BEM's PAECETrak Permitting and Outdoor Advertising Control products. As a VAR, Comtech will provide license and maintenance/support contract sales for BEM's products," and will provide "security testing and quality assurance testing" while also assisting BEM "with custom development of mobile data collection modules * * *." *Id.* at 15. "While BEM's [existing] software products substantially meet the requirements specified in the RFP with standard configuration, there are some requirements," BEM submitted, "that will require BEM to customize its software." *Id.* at 16.

{¶ 13} Although evidence suggests that BEM won the contract award on the strength of its commitment to direct to Comtech more than half of the money from BEM's price quote to the state, DAS did not review the technical abilities of subcontractors listed in the bids. Tr. at 69 (DAS's Sanders), *see also id.* at 129. And although the DAS procurement chief did "not know the details of [the BEM-Comtech] arrangement," DAS understood that Comtech would be acquiring and then "resell[ing]" BEM's PAECETrak to the state. *Id.* at 93. That is, Comtech would "contract with BEM" to license the software, *id.* at 118, with BEM passing its licenses through Comtech "[b]ecause they are their value-added reseller," *id.* at 119. So while BEM got its 150 MBE subcontractor plan points by virtue of its higher (54%) percentage payment *to* its subcontractor Comtech (as "reseller"), DAS did not know or inquire how much money back BEM would be receiving *from* that subcontractor (as purchaser). *See id.* at 108. DAS therefore had no understanding as to what portion of its contract price is to go to Comtech. *Id.* at 117-18 (Q. "And as you sit here today, you have no idea what portion, if any, is going to Comtech?" A. "Correct.").

{¶ 14} DAS adopted this bid scoring system, as apparently permitting a reselling component for its MBE subcontractor requirement (although Delasoft asserts that the subcontractor it designated to receive 17% of the contract amount was not to be a reseller,

*see* Tr. at 252), with no knowledge of any "predicate study" reflecting that Ohio has discriminated against Asian-Indians in software procurement, *id.* at 59, or otherwise, *id.* at 60. And DAS concedes that it did not consider any non-"race-based" efforts designed to boost participation in the field by disadvantaged groups. *Id.* at 60-61. DAS's Ms. Sanders testified that the subcontracting requirements are different from the state's 15% goal for agencies entering into contracts with MBE prime contractors, but she can point to no statutory authority regarding the former. *Id.* at 69. She confirmed that the subcontracting point award system is not the same thing as and is apart from the state's requirement that vendors have an approved affirmative action plan on file with the Equal Opportunity Division. *Id.* at 79, 81.

{¶ 15} Testimony from BEM and Comtech officials perhaps sheds a bit more light on their arrangement that helped BEM achieve the award. BEM's E-Business Director Kevin Courtney confirmed that "BEM would sell its PAECETrak software to Comtech," *id.* at 182, with "the cost that they would incur" being a then-yet-to-be-negotiated amount "somewhere between 80 and 95 percent" of BEM's "license price" as manufacturer, *id.* at 183-84. But his assumption was that BEM would charge the state its $1.6 million, and that Comtech "would bill directly to the State" as well. *Id.* at 185, *see also id.* at 197 (under a usual VAR agreement, "Comtech would need to purchase the licenses from us, sell it at the appropriate price to ODOT and then their portion, their revenue, is whatever the difference is. But their sales * * * going through the organization would be that 54 percent"); *compare id.* at 118 (DAS's Sanders is clear that Comtech does not have a contract with the state). Negotiations were still in progress, too, he said, as to what percent of the yearly service fee from the state Comtech would get. *Id.* at 193. Asked whether BEM could have provided its software licenses to the state without going through Comtech, Mr. Courtney acknowledged: "Yes, BEM could have provided it." *Id.* at 207.

{¶ 16} Comtech's President Mr. Nannapaneni, who says that the core offerings of his firm are "mainly focused on the data warehousing side," *id.* at 148, testified that Comtech had entered into a contract with BEM within the "last week" before his preliminary injunction hearing testimony, *id.* at 152. But while it is an open-ended purchase order for hourly work, it fixes no amount approaching the 54 percent of the $1.64 million contract figure that BEM had used. *Id.* at 214. Asked what capabilities he had

discussed with BEM at the time of that firm's RFP response, he led with a fact of significance:  "Like we have the MBE certification * * *."  *Id.* at 156; *see also* at 164.  But asked, "Have you worked with BEM's PAECETrak software prior to today?," he responded: "No."  *Id.* at 156.  *See also id.* at 156-57 (Q. "Do you have any idea what that software is?" A. "No."  Q. "Do you have any idea what you'll be asked to do in regards to that software?" A. "I don't know.");  *id.*  BEM and Comtech have had "no discussion about [BEM's] software."  *Id.* at 161.

{¶ 17}  Delasoft apparently learned the details of BEM's prevailing bid, with its 54% subcontracting figure and accompanying DAS scoring points, in March of 2019.  Evidence reflects that DAS had notified Delasoft by letter dated January 11, 2019 that Delasoft's proposal had not been selected.  Sanders Affidavit at ¶ 20 and Exhibit 2.  On February 5, 2019, the record shows, DAS responded to a Delasoft inquiry by stating that BEM had been awarded the contract on January 14, 2019.  Sanders Affidavit at ¶ 21 and Exhibit 3.  Delasoft made a public records request for materials related to the award on March 11, 2019, and received certain responsive materials from DAS that included the scoring information on March 25, 2019.  Sanders Affidavit at ¶ 22 and (subsequently verified) Complaint at Exhibit A at 119.  On April 1, 2019, Delasoft filed what it styled a "Notice of Protest" with DAS, arguing that BEM's proposal "failed to meet the requirements of the RFP for the MBE Subcontractor Plan" as not a true "set aside" and as not reflecting demonstrated qualifications by the entity proposed for more than half the work:  Delasoft asked that DAS cancel the award to BEM and award the contract to it.  Complaint Exhibit A at 119-20.  DAS denied that protest on July 11, 2019.  *Id.* at 122.

{¶ 18}  Naming DAS, DOT, and BEM as defendants, Delasoft then filed its Complaint for Declaratory and Injunctive Relief with the trial court on August 2, 2019.  Complaint. The complaint among other things invoked federal case law reciting that racial classifications by the government cannot stand unless they satisfy strict scrutiny; argued that the scheme applied by DAS in this instance did not meet strict scrutiny and "violated the Equal Protection Clause of the United States Constitution," injuring Delasoft; submitted that the subcontractor scoring approach used here fell outside of DAS's statutory authority; and alleged that "BEM confirms its intent to create Comtech as a sham sales front, and not a true service provider."  *Id.* at ¶ 13, 14-15, 33-34, 10, 30.  In its first count, the complaint

sought a declaratory judgment that DAS had acted arbitrarily, without legal authority, and in violation of "Delasoft's Constitutional rights" in applying the scoring procedures. *Id.* at ¶ 45-57. The second count sought injunctive relief "to preserve the status quo pending resolution of the parties' legal rights" given "ODAS's imminent award of a contract." *Id.* at ¶ 58-59. Delasoft prayed for a declaratory judgment that "the RFP process as applied" was illegal, and for temporary, preliminary, and permanent "injunctive relief * * * prohibiting an award pursuant to the current process." *Id.* at ¶ 59 and Prayer for Relief.

{¶ 19} The trial court conducted a hearing on Delasoft's temporary restraining order request on August 5, 2019. It denied the TRO on two bases: Delasoft had not filed an affidavit verifying its complaint until after the hearing had been conducted and, "[m]ore importantly," Delasoft had not shown a threat of irreparable harm because "the Court believes that any injury suffered by Plaintiff in not being awarded the contract from Defendants can be remedied by the legal remedy of monetary damages." August 9, 2019 Decision denying TRO at 2. *Compare Cementech*, 109 Ohio St. 3d at 477 (at least under competitive bidding laws, and so as to protect the taxpayers, a rejected bidder for a public contract cannot recover lost profits from the government); *Colosseo*, 2019-Ohio-2026, at ¶ 21 ("rejected bidder under a public contract * * * * cannot recover lost profits").

{¶ 20} It seems that shortly after the TRO hearing and decision, DAS provided Delasoft with two documents not previously produced: (1) the executed contract between DAS (on behalf of DOT) and BEM, dated January 14, 2019 with a "contract term * * * through June 30, 2019," further reciting that "[t]he State may renew this Contract for up to five (5) additional two-year term(s), subject to" the legislature's appropriation of funds and to "the satisfactory performance of the Contractor and the needs of" DAS, and (2) a (post-public-records-request) notice of June 26, 2019 from DAS renewing the contract "for the period of July 1, 2019 through June 30, 2021." Delasoft P.I. Exhibit H at 1-2.

**THE MID-HEARING DISMISSAL**

{¶ 21} The trial court set a preliminary injunction hearing for September 6, 2019. August 12, 2019 Notice of Preliminary Injunction Hearing. On the evening before that hearing, September 5, 2019, DAS filed a motion pursuant to Civil Rule 12(B)(1) to dismiss Delasoft's action for lack of subject-matter jurisdiction; it argued that injunctive relief was not available because the contract Delasoft sought to block already had been executed and

because work on the project had begun. The preliminary injunction hearing proceeded with testimony the next day, but DAS renewed its motion upon the close of Delasoft's preliminary injunction case. Tr. at 261. The trial court then adj0urned the hearing to permit further briefing on the DAS motion. *Id.* at 278-79.

{¶ 22} On October 30, 2019, the trial court granted DAS's motion to dismiss for lack of jurisdiction. The trial court noted that BEM had invoiced DAS for $65,000 (of the $1.64 million contract cap) on July 24, 2019 in connection with BEM's completion of the contract's "discovery phase," and that hearing testimony had adduced that "the design phase was just about completed and the development phase had started." October 30, 2019 Dismissal Decision at 2. "[I]f the act sought to be enjoined is a public-improvement contract, a rejected bidder cannot perform the public contract once performance commences even if the bidder demonstrates that its bid was wrongfully rejected," the trial court recited. *Id.* at 3, citing *Meccon*, 2010-Ohio-3297 at ¶ 12. Delasoft had been notified on February 5, 2019 that the contract had been awarded to BEM, the trial court stated, and "was aware of the questionable legality of ODAS awarding the contract to BEM [by] April 1, 2019 when it filed its protest letter." *Id.* at 3-4. It did not act promptly "after having notice of the questionable circumstances of the award," and the "requested relief would be barred because BEM had already started performing the contract as of July 24, 2019." *Id.* at 4 (citing *Colosseo* as citing the *Gaylor* "construction-related case"). "Here, the injunction was not timely sought and performance of the contract had already begun, rendering Plaintiff's causes of action for declaratory and injunctive relief moot," the trial court concluded. *Id.* at 5. Finding that it was "prohibited from granting relief on either" of Delasoft's claims, and with Delasoft's action "moot" and, with "no cognizable cause of action before the Court," the trial court did not proceed on the preliminary injunction hearing but instead granted DAS's motion to dismiss the case pursuant to Civil Rule 12(A)(1) for lack of jurisdiction. *Id.*

**ASSIGNMENTS OF ERROR AND STANDARDS ON REVIEW**

{¶ 23} Delasoft appeals, positing two assignments of error:

> [1.] The trial court erred in allowing the continuation of a public contract, awarded using unconstitutional racial criteria.
>
> [2.] The trial court erred in dismissing for mootness a challenge of an illegal public contract, setting an impossible threshold to protest and thus evading review.

Appellant's Brief at ii.

{¶ 24} Whether the trial court erred in dismissing Delasoft's action depends on whether its finding of mootness was appropriate at this juncture. We therefore center our focus on Delasoft's second assignment of error first, while realizing that there is substantial overlap between the assignments as argued by both sides. We have reviewed the record and read all the briefs, noting that DOT adopts DAS's briefing and that BEM does, too (while also advancing certain arguments relating to its "VAR" status, conceding that "Comtech, as the MBE subcontractor, will not keep the entire 54% of the Contract amount that BEM initially pays it," and urging that "even if BEM fails during the course of performance to include Comtech to the full 54% that it included in its proposal, that does not support a bid protest by Delasoft," *see* Appellee BEM Brief at 1, 7, 17).

{¶ 25} As we repeated in *Modern Office*, an " 'appellate court reviews an appeal of a dismissal for lack of subject-matter jurisdiction under a de novo standard of review.' " 2012-Ohio-3587 at ¶ 8, quoting *Crable v. Ohio Dept. of Youth Servs.*, 10th Dist. No. 09AP-191, 2010-Ohio-788, ¶ 8. " 'The standard for determining a Civ.R. 12(B)(1) motion to dismiss for lack of subject matter jurisdiction is whether the complaint states any cause of action cognizable in the forum.' " *Id.,* quoting *Univ. of Toledo v. Ohio State Emp. Rel. Bd.*, 10th Dist. No. 11AP-834, 2012-Ohio-2364, ¶ 8. We also observed in *Modern Office* that "[t]he principles controlling a Civ.R. 12(B)(6) motion to dismiss for failure to state a claim are similar to those governing a Civ.R. 12(B)(1) motion to dismiss for lack of subject-matter jurisdiction." *Id.* at ¶ 9, citing *Blankenship v. Cincinnati Milacron Chems., Inc.*, 69 Ohio St.2d 608, 610-11 (1982), *overruled in part on other grounds*, and *Gambee v. Gambee*, 2d Dist. No. 82-CA-45, 1983 Ohio App. Lexis 12730 (Aug. 11, 1983). DAS correctly notes that the issue of mootness, which provided the premise for dismissal here, may be adjudicated from materials going beyond the complaint and presents a question of law subject in its own right to de novo review. Appellee DAS Brief at 15.

**ANALYSIS**

{¶ 26} Our assessment is not made easier by the parties' having largely talked past one another on the central issue of whether injunctive and declaratory relief was even potentially available to Delasoft at the time the trial court ruled on DAS's motion to dismiss.

{¶ 27}   DAS argued to the trial court, as it argues to us, that such relief was precluded under a *Meccon*-type analysis because "Delasoft did not timely invoke the jurisdiction of [the] court prior to the award or the commencement of the contract."  *See* DAS Motion to Dismiss at 4-5, citing *Meccon* and *Cementech,* and quoting the Court of Claims post-remand in *Meccon* (quoting the *Gaylor* construction case) saying that "[i]f the rejected bidder fails to act promptly and the successful bidder commences to work on the project, injunctive relief is not available," 2012-Ohio-6334, ¶ 14; *see also* DAS Brief at 24.  "Ohio precedent looks merely at whether '*construction commences*' and not at the percentage of completion of the total contract as Delasoft advocates," DAS tells us.  Appellee DAS Brief at 23-24 (emphasis added), citing *Colosseo* citing *Gaylor*; *id.* at 24, citing *Meccon.*  But neither DAS nor the trial court provided any argument on or analysis of whether the arrangement here is in the nature of a construction or other public-improvement contract.

{¶ 28}   *Meccon* repeatedly emphasized its "public-improvement contract" context, *see, e.g.,* 2010-Ohio-3297 at ¶ 1, 2, 13, and 12 (providing the line to which DAS cites that "[u]nder our precedent, once the public-improvement work commences or is completed, the rejected bidder will not be able to perform the public contract even if the bidder" shows illegality).  *See also Colosseo*, 2019-Ohio-2026, at ¶ 23 (scoreboard replacement contract completed; "once a rejected bidder's request for preliminary injunctive relief has been denied and work begins on a public-improvement project," the rejected bidder cannot gain the contract).  But DAS simply has assumed that the contract here—as solicited under provisions for goods and services contracts, and not under the laws regarding "public improvements," *compare* R.C. Chapter 125 (DAS "Office Services") *with* Chapter 153 ("Public Improvements")—is appropriately considered under the same rubric as a "construction"/"public-improvement"-type contract.  The trial court followed that course, again without analysis.

{¶ 29}   Delasoft, by contrast, has not addressed *Meccon* directly at all, either to the trial court or here.  *See, e.g.,* September 19, 2019 Plaintiff's Memo Contra Defendant's Motion to Dismiss at 15-17; Appellant's Brief and Reply Brief (no discussion of *Meccon* or *Colosseo*).  Rather, Delasoft responds to the mootness issue by arguing, in part, that it is entitled to relief because "[a] public contract issued contrary to law is null and void ab initio," September 19, 2019 Memo Contra at 15 and Appellant's Brief at 26, and that

"precedent * * * affirms that an injunction against performance of a contract illegally awarded is not moot," Memo Contra at 16 and Appellant's Brief at 26 (different emphases omitted). For that proposition, Delasoft principally relies on this court's decision in *Griffin Indus. v. DAS*, 10th Dist. No. 00AP-1139, 2001 Ohio App. Lexis 3387 (August 2, 2001). There, in addressing a taxpayer challenge to diesel fuel purchases under ongoing contracts that had been "in force for a significant period of time," we found that the case was not moot because the contracts had not been completed: "the complaint demands an injunction against performance of the bio-diesel contracts, not merely against their award. State contracts awarded under conditions contrary to law are void and unenforceable." *Id.* at *2 (citations omitted).

{¶ 30} If this case is controlled by the analysis used in *Meccon* and *Colosseo*, Delasoft's request for injunctive and declaratory relief would be moot because work under the contract as renewed has begun. If it is controlled by our analysis in *Griffin*, it would not be moot because the contract could be shifted away from prevailing bidder BEM if the law and the equities so indicated.

{¶ 31} The lines of cases are distinguishable from and not inconsistent with each other. A different supplier of fuel oil could deliver the next round of product in *Griffin* without replicating or depending on previous deliveries. We see that attribute of the relevant contracts there as far more significant to the analysis here than contentions about the taxpayer standing in that case. *Compare* Decision Granting Motion to Dismiss at 4; *compare also Griffin* at *12 (contrasting contracts ongoing "for a significant period of time" with "*completed* contracts" (emphasis in original)). By contrast, *Meccon*, *Colosseo*, and others in their line address situations, with construction as a quintessential example, in which one task substantially builds on what has been done before and in which a shift of providers inevitably would burden taxpayers with significant extra cost beyond the costs associated with any one bid. *See, e.g., Meccon*, 126 Ohio St.3d at 234 (describing rule that may allow recovery of public improvement bid contract preparation costs [costs not claimed by Delasoft here] but that precludes injunctive relief once public improvement work has commenced, together with bar on recovery of lost profits, as being "best calculated to strike a balance between protecting the public from incurring *extra* cost due to the misconduct of the public authority, ameliorating the [wronged best bidder's] damages * * *

in its good-faith participation in the competitive bidding process, and deterring the public authority from violations of the competitive-bidding law" (emphasis added).

{¶ 32} We would be open to considering the argument that the contract at issue here (perhaps, and depending on facts to be developed, even with *each* of its contemplated five two-year renewals) fits the *Meccon* paradigm better than the *Griffin* example even if it does not fall within the normal ambit of a "public improvements" contract and was issued as a goods and services contract. But we find no case in which we have extended the "construction commence[d]" rule to the goods and services sphere, and we do not think it wise to do so here without the record having been more fully developed and assessed by the parties and the trial court as to whether and to what degree the contemplated sales and activities fit the category to which that rule applies.

{¶ 33} In *Modern Office*, we considered a plaintiff's demand for bid preparation costs under *Meccon* in connection with an RFP from The Ohio State University relating to the lease and maintenance of many "multi-functional devices" used for printing, scanning, copying, and faxing. 2012-Ohio-3587 at ¶ 20, 2. Through its lawyers in the Attorney General's Office, the University argued against "extending the principle set forth in *Meccon,* which involved a public-improvement project, to the RFP process." *Id.* at ¶ 20. After describing the public-improvement context of *Meccon* and the condition where " 'injunctive relief is no longer available because the project has already been started,' " *id.* at ¶ 21, quoting *Meccon* at ¶ 1, we found *Meccon* "not applicable to the circumstances" there, *id.* at ¶ 22:

> First, we note that the instant case does not involve a state public-improvement project subject to competitive-bidding laws like in *Meccon*, but rather a contract with OSU for goods and services established using the RFP process. Unlike the extensive statutory provisions which regulate the competitive bidding process for state public improvement projects (*see*, for example, R.C. 9.312 and R.C. Chapter 153), the RFP process in this case is not governed by that same statutory scheme. Instead, the General Assembly has provided OSU and other public owners involved in the purchase of goods and services using the RFP process with broad discretion to fashion their own rules, rather than requiring them to conform to the strict requirements of R.C. 9.312 and R.C. Chapter 153. This differentiates the instant case from *Meccon.*

2012-Ohio-3587, at ¶ 23.

{¶ 34} We left the door to doctrinal extension ajar, however: "As noted above, the contract at issue involves one for goods and services, rather than a construction project. Even assuming, for purposes of this argument (but without deciding), that the process set forth in *Meccon* regarding the recovery of bid preparation costs is applicable to a goods and services contract negotiated using the RFP process," the plaintiff would not qualify for costs under *Meccon* because that public improvements case required prompt filing for injunctive relief as a "precondition" to such recovery without weighing any other factors. *Id.* at ¶ 24.

{¶ 35} The Court of Appeals for the First District has been more emphatic in evaluating the distinction between public improvements contracts and goods and services contracts. *Empower Aviation* involved a five-to-fifteen-year Fixed Base Operator service agreement and followed the plaintiff's earlier investment in equipment and technology. 2009-Ohio-6331, at ¶ 2, 3. The trial court's denial of a preliminary injunction against the contract was not immediately appealable, the First District determined, because although lost profits are not recoverable (and would be forgone to the extent that the competitor firm was operating under the contract), final injunctive relief could be granted down the line: "The contract at issue here involves a contract for services, not construction, and the term of the contract is lengthy—a five-year minimum. This demonstrates that an appeal after a judgment on the merits would not prevent a meaningful or effective remedy. If Empower does not prevail after a trial on the merits and that judgment is reversed on appeal, this court can void the FBO contract between the county and [the other bidder]. * * * * [T]he appropriateness of the ultimate relief Empower seeks -- to be declared the successful proposer -- will not be determined until the merits are resolved, and Empower's ability to obtain this relief will not be affected by delaying the appeal until the determination of the case on the merits." *Id.* at ¶ 25.

{¶ 36} On the state of this record, and without focused explication by the parties and the trial court—and mindful, too, in the words of the First District that "the term of the contract is [potentially] lengthy"—we are reluctant at this juncture to seize this opportunity to do what we declined to do in the *Modern Office* context and extend the full legal structure governing injunctions of public improvements contracts to goods and services contracts.

{¶ 37} The record as it now stands perhaps offers some competing considerations as to how this contractual arrangement should properly be categorized for assessing

potentially available relief.  On the one hand, the RFP was for the provision of goods and services and did specify its "objective" as being "to find a commercial off the shelf (COTS) system."  RFP at 3.  On the other hand, arguably, the RFP did contemplate the development of new software "if an existing software application cannot be found."  *Id.*  Back to the first hand, Delasoft's President testified that in the context of these purposes, "our products do not require extensive customization."  Tr. at 226 (Satish Dola).  And BEM's E-Business Director describes PAECETrak as "a COTS system, commercial off the shelf software," while adding that "ODOT had some specific business requirements that caused the software to be modified and customized."  Tr. at 178 (Courtney); *see also* BEM's bid at 4 ("BEM's software products substantially meet the requirements specified in the RFP with standard configuration, [but] there are some requirements that will require BEM to customize its software").  Much of the arrangement, in any event, involves the periodic licensing of software over the contemplated ten-year period.  *See* Tr. at 119 (DAS's Sanders answers "Correct" to the question, "you're expecting Comtech to give the licenses, but they had to get those from BEM?"); 182 (BEM's Courtney seems to suggest that software package plus support amounts to "over 1.2 million" of $1.64 contract price).  At the time of the preliminary injunction hearing, BEM had billed DAS for $65,000 under the contract—for completion of largely unspecified "discovery"; we find no real indication as to whether, for example, the information adduced would be readily transferrable from DAS to other providers.  *Id.* at 188; *see also* BEM invoice at Delasoft Exhibit I.  Comtech, incidentally, did not share in that $65,000, and will not share in the $85,000 that BEM was to bill for "design."  *Id.* at 188-89.  "Development" had "actually started," but the details of that effort, too, remain murky from the trial court record.  *Id.* at 189.

{¶ 38} In short, the extent to which another provider could step in without the additional burden to the taxpaying public forestalled by the construction-like, hard to unwind, "public improvement" contracts line of cases (if, for example, a contemplated contract renewal for 2021, or 2023, or 2025, or 2027 were sought to be enjoined as arising from an illegal initial contract) is not readily apparent from the record as presented to us. The basis for treating this as a *Meccon*-type public improvements contract as opposed to a *Griffin-* or *Empower Aviation* goods and services-type contract has not been established sufficiently at this point to support dismissal of the case under the standards governing Civil Rule 12(B)(1).

{¶ 39} And outside of the public improvements-type context, Delasoft's delay in suing (while opting to pursue an administrative "protest" process nowhere specified in the relevant statutes and that did not invoke the full range of concerns that Delasoft now voices) may appropriately be a significant factor for the trial court to weigh in deciding whether to grant an injunction—but is not by itself and without reference to injury or prejudice an inexorable, automatic bar to the injunctive relief Delasoft seeks. (The passage of months trying to convince DAS to change its decision before suit well could be a bar to recovery of bid preparation costs under *Meccon*, if *Meccon* public improvements analysis is found to apply, but Delasoft here does not ask to recover such costs and they are not at issue.)

{¶ 40} DAS's citation to *Sweda, Inc. v. DAS*, 10th Dist. No. 87AP-858, 1988 Ohio App. Lexis 1217 (March 22, 1988), *see* Appellee DAS Brief at 21, makes the point that DAS's timing argument, apart from the public improvements contract "construction commenced" context, relates to "[t]he equitable doctrine of laches." *See Sweda* at *11. *Sweda* underscored that " '[d]elay in asserting a right does not of itself constitute laches, and in order to successfully invoke the equitable doctrine of laches [it] must be shown that the person for whose benefit the doctrine will operate has been materially prejudiced by the delay of the person asserting his claim.' " *Id.*, quoting *Smith v. Smith*, 168 Ohio St. 447 (citation corrected from *Sweda*), paragraph three of the syllabus (1959), *superseded by statute on other grounds.* Here, the trial court, which did not reach the merits even of the preliminary injunction, did not weigh the equities or make any determination of material prejudice (with regard to questions of future contract renewal, for example) before determining under *Meccon* and *Colosseo* that "the injunction was not timely sought and performance of the contract had already begun, rendering Plaintiff's causes of action for declaratory and injunctive relief moot." Decision Granting Motion to Dismiss at 4-5. Contrary to DAS's implication, *see* DAS Brief at 23, the trial court did not "consider the amount of progress made under the contract" before dismissing the case, but rather ordered the dismissal because performance had "already begun." And while arguments for an affirmative defense such as laches "can be a consideration in weighing the factors involved in evaluating a motion for a preliminary injunction, they are not dispositive of the merits at that stage of the case." *Watson v. Caldwell Hotel, LLC*, 7th Dist. No. 16 NO 0432, 2017-Ohio-4007, ¶ 48 (adding at ¶ 49 that "the affirmative defense of laches or estoppel

can be evaluated in ascertaining the likelihood of success on the merits. These are affirmative defenses to the complaint, and the [defendant] would have the burden of establishing these affirmative defenses at trial").

{¶ 41} Although we understand the trial court to have grounded its dismissal on the fact that "performance of the contract had already begun," Dismissal Decision at 5, it did observe that the "complaint requests an injunction preventing the award of the contract, not injunctive relief preventing performance of the contract," *id.* at 3 citing Prayer at (B), and added: "Therefore, the Court will consider the timing of Plaintiff's complaint as it relates to the contract being awarded, not the performance of the contract," *id.* at 3. That is not how the trial court then proceeded, and despite the urgings of DAS, *see* DAS Brief at 17-19, it would have been wrong to hinge dismissal on that phrasing in the complaint's prayer (especially when it is undisputed that DAS did not produce the January executed contract in response to Delasoft's March public records request, and did not make it available until after the August TRO hearing).

{¶ 42} The preliminary injunction hearing, as interrupted by dismissal of the case, had proceeded on the premise that Delasoft seeks to gain for itself the contemplated future years of work. Civil Rule 15 provides in part that even evidence objected to *at trial* as beyond the pleadings may be admitted, for "the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his * * * defense upon the merits." Civ.R. 15(B); *see also, e.g., Hall v. Bunn*, 11 Ohio St.3d 118, 122 (1984) (even at trial, "[m]ere surprise is generally rejected as a basis for exclusion"). Indeed, in responding to DAS's motion to dismiss, Delasoft offered to amend its complaint "to ask for termination of continued performance," noting that "[i]t is typical that discovery reveals facts not available prior to filing an initial pleading, and for amendment so that the pleadings conform to the evidence." September 19, 2019 Delasoft Memo Contra Motion to Dismiss at 17. That language in the prayer was not reason for dismissal at such a preliminary phase of the case. Civ.R. 15(B); *see also, e.g., Springfield v. Palco Invest. Co.*, 2d Dist. No. 2012 CA 52, 2013-Ohio-2348, ¶ 50 ("Civ.R. 15(B) allows an amendment to a pleading to be made at any time,

even after judgment, and the rule is to be liberally construed in an effort to decide cases on their merits").

{¶ 43} Finally, even though they are more in the nature of a Civ.R. 12(B)(6) failure to state a claim theory than of jurisdictional argument going to the Civ.R. 12(B)(1) dismissal, we cannot allow to go unremarked DAS's repeated suggestions that Delasoft cannot advance its case because its owners are of Asian-Indian extraction. *See, e.g.,* Tr. at 263 (DAS counsel in arguing motion to dismiss says: "We actually have a plaintiff that is an Asian-Indian owned business claiming it got discriminated against because the State went ahead and awarded a contract that subbed out more work to who? An Asian-Indian owned business. Right there[,] there cannot be racial discrimination in this case"); *see also* DAS Brief at 43 (DAS "awarded a contract to an offeror who subcontracted a great amount of work to an Asian-Indian subcontractor. Delasoft is an Asian-Indian subcontractor. Both are owned by people of the *same race*") (emphasis in original; then arguing that such facts would not give rise to a [nowhere here alleged] claim of employment discrimination). The same argument echoes in DAS's proposition that Delasoft cannot prevail "because ODAS did not require any set-aside and allowed non-minority (BEM) and minority (Delasoft) firms to submit offers for the work." DAS Brief at 37.

{¶ 44} Setting aside the question of whether BEM's arrangement with Comtech was for "a great amount of work," or "more work" than the 17% Delasoft proposed for its MBE subcontractor (and by our math, Comtech's anticipated repayment to BEM of something approaching 90% of the promised [to DAS, albeit not to Comtech] 54% of the contract price would leave Comtech with something under 6%), case authority that DAS heralds eviscerates its contention that the ethnicity of Delasoft's owners bars Delasoft's complaint. In *Ritchey Produce Co. v. ODAS*, 85 Ohio St.3d 194, 204 (1999), the Supreme Court of Ohio recited that "governmental classifications based on race, even purportedly 'benign' or 'remedial' racial classifications of the type at issue here [in construing Ohio's MBE program for contractors], are constitutional only if they are 'narrowly tailored measures that further compelling governmental interests' " (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995)). "[T]he strict scrutiny standard clearly applies to our review of Ohio's MBE set-aside program * * *." *Id.* at 252.

{¶ 45} DAS's assertions about the heritage of Delasoft's owners in no way precludes Delasoft from pursuing its claim that DAS's race-conscious examination of proposed subcontractors in scoring the contract at issue injured Delasoft in violation of constitutional norms. We can leave to the trial court to determine in the first instance, if and as appropriate, (1) whether *Ritchie's* holdings with regard to purchasing contracts would countenance an administratively designed scheme that disregards race at the general contractor level buts then makes race potentially dispositive at the subcontractor level so as to displace one bidder in favor of a "non-minority" bidder who claims a subcontractor of the "same race" as the disfavored bidder—yet who really commits to transferring only pennies on the dollar to the subcontractor after accounting for massive charge-backs, and (2) whether for purposes of Delasoft's federal claims *Ritchie* was overtaken by the federal Sixth Circuit's later decision in *Associated Gen. Contrs. of Ohio, Inc. v. Drabik*, 214 F.3d 730 (6th Cir.2000). Like *Ritchie, Drabik* recognized that " 'all racial classifications imposed by whatever federal, state, or local governmental actor' " are unconstitutional unless they withstand strict scrutiny. 214 F.3d at 734, quoting *Adarand*, 515 U.S. at 227. Indeed, it was on that basis that *Drabik* invalidated the "state construction set-asides" there (while noting that "[a]lthough *Ritchie* involved * * * MBEs in purchasing contracts, the statistics and the rationale underlying both those MBE programs are the same" and that "a federal constitutional question is at issue"). *Id.* at 740. DAS cannot use the race or heritage of Delasoft's husband and wife owners to preserve the dismissal at issue here. DAS's affirmation of "the possibility that Delasoft will be subject to the same RFP scoring rule if it bids for other work in Ohio," Appellee DAS Brief at 30, only causes us to underscore the point.

**CONCLUSION**

{¶ 46} We sustain Delasoft's second assignment of error to the extent that it identifies error in the trial court's dismissal of the case as moot on the record compiled to that point. Because we will remand the case to the trial court for further proceedings consistent with this ruling, we do not reach Delasoft's first assignment of error and make no determination of the appropriate ultimate disposition of the preliminary injunction motion or the case. *Compare, e.g., Westfield Ins. Co. v. Hunter*, 128 Ohio St.3d 540, 2011-Ohio-1818, ¶ 46 ("upon remand, the record must be further developed to allow for

consideration of the [insurance policy] exclusion's applicability, under the standards that properly govern the exclusion's reach").  Because we will not make a final merits ruling before all parties have had an opportunity to put on their evidence and arguments and before the trial court has weighted the equities (including the timing of Delasoft's filing against potential undue prejudice to the defendants from prospective remedies, and including the public interest, and any potential "unclean hands" considerations) and before it has considered all potentially appropriate outcomes, we overrule Delasoft's first assignment of error as moot; we express no judgment on the validity of the contract or the propriety of injunctive relief.

{¶ 47} We reverse the trial court's judgment and remand the case to the trial court for further proceedings consistent with this decision.

*Second assignment of error sustained in part; first assignment of error overruled as moot; judgment reversed and cause remanded for further proceedings.*

DORRIAN and BEATTY BLUNT, JJ., concur.