[Cite as *Delasoft, Inc. v. Ohio Dept. of Adm. Servs.*, 2022-Ohio-3403.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Delasoft, Inc., | : | |
| Plaintiff-Appellant, | : | |
| | : | No. 22AP-85 |
| v. | : | (C.P.C. No. 19CV-6257) |
| Ohio Department of Administrative Services et al., | : | (REGULAR CALENDAR) |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

D E C I S I O N

Rendered on September 27, 2022

**On brief:** *Luther L. Liggett, Jr.*, for appellant.
**Argued:** *Luther L. Liggett, Jr.*

**On brief:** *Dave Yost*, Attorney General, *Hilary R. Damaser, Keith O'Korn*, and *Stephanie Slone*, for appellees Ohio Department of Administrative Services and former Director Matt M. Damschroder. **Argued:** *Keith O'Korn*.

**On brief:** *Taft Stettinius & Hollister LLP*, and *William J. Beckley*, for appellee BEM Systems, Inc.

**On brief:** *Dave Yost*, Attorney General, and *L. Martin Cordero,* and *Corrina V. Efkeman*, for appellees Ohio Department of Transportation and Director Jack Marchbanks.

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Plaintiff-appellant, Delasoft, Inc., appeals from judgments of the Franklin County Court of Common Pleas granting motions to dismiss Delasoft's claims filed by defendants-appellees the Ohio Department of Administrative Services ("ODAS"), Matthew

Damschroder, the Ohio Department of Transportation ("ODOT"), Jack Marchbanks, and BEM Systems, Inc. ("BEM") (collectively, "appellees"). For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} This appeal arises from Delasoft's challenge to the award of a state contract to BEM. The facts related to the award and Delasoft's challenge are set forth in detail in this court's decision on a prior appeal. *Delasoft, Inc. v. Ohio Dept. of Adm. Servs.*, 10th Dist. No. 19AP-761, 2020-Ohio-3558, ¶ 6-22. For purposes of this appeal, we will briefly outline the relevant facts.

{¶ 3} In July 2018, ODAS issued a request for competitive sealed proposals ("RFP") on behalf of ODOT seeking an online system for right-of-way and outdoor advertising permits. The RFP described the system sought:

> The objective of this Request for Proposal opportunity is to find a commercial off the shelf (COTS) system (or develop an online web-based permitting system if an existing software application cannot be found) that can meet the department's twofold needs: 1.) to purchase a web-based permitting system, and which demonstrates the capabilities and resources required to provide a next generation permit application system for use by ODOT. And 2.) to provide a web-based Outdoor Advertising Control System to support the permitting process for signs and billboards for ODOT. The Contractor must provide all requirements analysis, configuration, installation and on-going maintenance.

(Req. for Proposal at 3, Ex. A to Compl.) The RFP provided that the initial term of the contract was from the award date through June 30, 2019, and that the contract could be renewed for up to five additional two-year terms, subject to appropriation of funds by the General Assembly. The RFP was not a minority business enterprise ("MBE") set-aside contract but included an "MBE Subcontractor Plan." *Delasoft* at ¶ 9.

{¶ 4} Of the entities that submitted bids, only BEM and Delasoft satisfied the mandatory criteria in the RFP to have their bids scored. *Id.* at ¶ 11. The bids were scored based on three metrics: (1) the technical proposal, (2) the cost cap, and (3) the MBE subcontractor plan. *Id.* Delasoft received the higher score for its technical proposal and BEM received the higher score for its cost cap. *Id.* BEM also received the higher score for its proposed MBE subcontractor set-aside. BEM's bid indicated that 54 percent of its bid

price would go to an MBE subcontractor, while Delasoft proposed a 17 percent MBE subcontractor set-aside. *Id.* Ultimately, BEM received the higher total score and was awarded the contract. *Id.*

{¶ 5} ODAS notified Delasoft, by letter on January 11, 2019, that its proposal had not been selected. *Id.* at ¶ 17. In response to an inquiry, on February 5, 2019, ODAS informed Delasoft that BEM had been awarded the contract as of January 14, 2019. *Id.* Delasoft filed a "Notice of Protest" with ODAS on April 1, 2019, asserting BEM's bid did not meet the requirements of the RFP regarding the MBE subcontractor plan. Delasoft's protest requested that ODAS cancel the award to BEM and instead award the contract to Delasoft. *Id.* ODAS denied Delasoft's protest on July 11, 2019.

{¶ 6} On August 2, 2019, Delasoft filed a complaint for declaratory and injunctive relief against ODAS, ODOT, and BEM. *Id.* at ¶ 18. Delasoft sought a declaratory judgment that the RFP process was illegal and temporary, preliminary, and permanent injunctions prohibiting an award of the contract pursuant to the RFP. *Id.* The trial court conducted a hearing on Delasoft's request for a temporary restraining order. The court denied the temporary restraining order because Delasoft did not file an affidavit verifying its complaint until after the hearing and because it found Delasoft failed to show a threat of irreparable injury because any injury suffered from not being awarded the contract could be remedied through monetary damages. *Id.* at ¶ 19. On the eve of a preliminary injunction hearing, ODAS moved to dismiss for lack of subject-matter jurisdiction, asserting injunctive relief was not available because the contract had been executed and work had begun. *Id.* at ¶ 21. The trial court held the preliminary injunction hearing but adjourned for further briefing on the motion to dismiss when ODAS renewed its motion at the close of Delasoft's case.

{¶ 7} On October 30, 2019, the trial court granted ODAS's motion to dismiss for lack of subject-matter jurisdiction, concluding the claims were moot because Delasoft did not act promptly after having notice of the circumstances of the contract award and performance of the contract had begun. *Id.* at ¶ 22. Delasoft appealed, arguing the trial court erred by dismissing for mootness because the contract was awarded using unconstitutional racial criteria. *Id.* at ¶ 23. As explained more fully below, this court concluded the record was insufficiently developed to determine whether the contract should be analyzed under precedents involving public improvement contracts or those

involving public contracts for goods and services. *Id.* at ¶ 1, 32. We sustained Delasoft's second assignment of error in part and remanded to the trial court for further development of the record. *Id.* at ¶ 46.

{¶ 8} On remand, Delasoft amended its complaint, adding a claim under Title 42, Section 1983 of the United States Code for violation of its civil rights against Marchbanks, the director of ODOT, and Damschroder, the director of ODAS. Pursuant to a motion from ODAS and BEM to stay discovery, the trial court limited discovery to "evidence that is relevant to whether the contract between BEM and ODAS was a public improvement/construction type contract or a goods and services type contract." (Sept. 22, 2020 Decision & Entry at 6.) Appellees moved to dismiss the amended complaint, again asserting the claims for injunctive relief were moot because performance of the contract commenced before Delasoft filed suit, and the Section 1983 claim failed to state a claim upon which relief could be granted.

{¶ 9} The trial court conducted an evidentiary hearing "on the subjects of: (1) whether the contract or the renewal or modification of the contract between BEM and the other Defendants is a goods and services contract and whether the public improvement/construction analysis in *Meccon, Inc. v. Univ. of Akron*, 126 Ohio St.3d 231, 2010-Ohio-3297, 933 N.E.2d 231 applies; and (2) whether the contract between BEM and the other Defendants can be shifted to Delasoft without burdening the taxpayers to recreate BEM's work." (Feb. 16, 2021 Order at 1.) At the hearing, ODOT presented testimony from three employees who had worked on the project with BEM, BEM presented testimony from the director of its software business unit, and Delasoft presented testimony from its executive vice president.

{¶ 10} Following the hearing, on September 22, 2021, the trial court issued a decision ("the September decision") granting in part appellees' motions to dismiss for lack of subject-matter jurisdiction because it concluded Delasoft's claims for declaratory judgment and injunctive relief were moot. With respect to the Section 1983 claim, the trial court converted the motions to dismiss to a motion for more definite statement under Civ.R. 12(E) and permitted Delasoft to amend its complaint to clarify the Section 1983

claim.[1]  Delasoft filed a second amended complaint; Marchbanks and Damschroder then moved to dismiss the second amended complaint.  The trial court granted Marchbanks' and Damschroder's motions to dismiss in a decision issued on January 21, 2022 ("the January decision"), concluding the second amended complaint failed to state a claim upon which relief could be granted.  Delasoft timely appealed from the January decision.

## II.  ASSIGNMENTS OF ERROR

{¶ 11} Delasoft assigns the following as trial court error:

> [1.] The trial court erred by procedurally failing to reach the merits of a goods-and-services contract awarded using unconstitutional racial criteria, declaring the case moot as in a construction contract.

> [2.] The trial court erred in dismissing for mootness a challenge of an illegal public contract yet to be performed, setting an impossible threshold to protest and thus evading review.

> [3.] The trial court erred by dismissing the claim of discrimination by ignoring the overt facts pleaded.

## III.  STANDARD OF REVIEW

{¶ 12} The standard for dismissal of a complaint for lack of subject-matter jurisdiction under Civ.R. 12(B)(1) is whether the complaint states any cause of action cognizable in the forum.  *Delasoft* at ¶ 25.  We review de novo a trial court's decision dismissing a case for lack of subject-matter jurisdiction.  *Id.*

{¶ 13} "A motion to dismiss under Civ.R. 12(B)(6) for failure to state a claim is procedural and tests the sufficiency of the complaint." *Modern Office Methods, Inc. v. Ohio State Univ.*, 10th Dist. No. 11AP-1012, 2012-Ohio-3587, ¶ 9.  A motion to dismiss for failure to state a claim may be granted "if, after all factual allegations are presumed to be true and all reasonable inferences are made in favor of the non-moving party, it appears beyond doubt from the complaint that the plaintiff could prove no set of facts warranting the requested relief." *Id.*  We review de novo a decision dismissing for failure to state a claim upon which relief can be granted.  *Id.*

---

[1] Delasoft appealed the September decision to this court, but we dismissed for lack of a final appealable order because the September decision did not resolve the Section 1983 claim and lacked Civ.R. 54(B) language. *Delasoft, Inc. v. Ohio Dept. of Admin. Servs.*, 10th Dist. No. 21AP-531 (Nov. 4, 2021).

## IV. LEGAL ANALYSIS

### A. Whether Delasoft's claims for declaratory judgment and injunctive relief were moot

{¶ 14} In its first assignment of error, Delasoft argues the trial court erred by concluding its claims for declaratory judgment and injunctive relief were moot because performance under the contract had begun before Delasoft filed suit.

{¶ 15} As explained in our prior decision, when dealing with suits challenging the award of public contracts, courts have recognized a distinction between public improvement or construction contracts, where injunctive relief is not available to a disappointed bidder once performance under the contract has begun, and contracts for goods and services, where injunctive relief may be available after performance has begun.[2] *Delasoft* at ¶ 4-5, 27-29. Thus, our prior decision framed the issue to be determined by the trial court on remand:

> If this case is controlled by the analysis used in *Meccon* and *Colosseo* [*USA, Inc. v. Univ. of Cincinnati*, 1st Dist. No. C-180223, 2019-Ohio-2026], Delasoft's request for injunctive and declaratory relief would be moot because work under the contract as renewed has begun. If it is controlled by our analysis in *Griffin* [*Industries, Inc. v. Ohio Dept. of Admin. Servs.*, 10th Dist. No. 00AP-1139 (Aug. 2, 2001)], it would not be moot because the contract could be shifted away from prevailing bidder BEM if the law and the equities so indicated.

*Id.* at ¶ 30.

{¶ 16} Explaining the distinction between the *Meccon/Colosseo* analysis and the *Griffin* analysis, the court explained that *Griffin* involved a contract to supply fuel oil and, if the contract was found to have been improperly awarded, a different supplier could deliver the next round "without replicating or depending on previous deliveries." *Id.* at ¶ 31. Similarly, we noted that we had declined to extend the *Meccon* analysis to a case involving a contract related to the lease and maintenance of multi-function printers but had "left the

---

[2] As recognized in our prior decision, bid preparation costs may be recoverable in a public improvement case under *Meccon* even after work has commenced, but Delasoft does not seek to recover bid preparation costs in this case. *Delasoft* at ¶ 31, 39.

door to doctrinal extension ajar" in that case. *Id.* at ¶ 34 (describing *Modern Office Methods*).[3]

{¶ 17} The court further explained that "[b]y contrast, *Meccon*, *Colosseo*, and others in their line address situations, with construction as a quintessential example, in which one task substantially builds on what has been done before and in which a shift of providers inevitably would burden taxpayers with significant extra cost beyond the costs associated with any one bid." *Id.* at ¶ 31. The court noted that "the extent to which another provider could step in without the additional burden to the taxpaying public forestalled by the construction-like, hard to unwind, 'public improvement' contracts line of cases * * * [was] not readily apparent from the record as presented to [it]." *Id.* at ¶ 38.

{¶ 18} At the hearing on remand, the parties stipulated that the contract was "a contract for supplies and services procured pursuant to Revised Code 125.071, not a public improvement contract procured pursuant to Chapter 153." (Mar. 16, 2021 Tr. at 8.) In the September decision, the trial court concluded the contract "has some similarity to a construction contract in that the software and underlying code, while considered by BEM as a commercial off-the-self product (COTS), are the building blocks of the project, and are also the proprietary and intellectual property of BEM." (Sept. 22, 2021 Decision at 5-6.) The court noted, however, that the annual contract renewals for maintenance and support were "dissimilar from a typical construction or public works contract where the work is normally completed within a certain time-period and the contract is fulfilled and terminated." (Sept. 22, 2021 Decision at 6.) Ultimately, the trial court concluded that although the contract was for goods and services rather than public improvements, the "configured off the shelf computer program and database constructed" under the contract was analogous to a construction project subject to *Meccon* analysis. (Sept. 22, 2021 Decision at 11-12.) The court reasoned that Delasoft could not step into BEM's shoes to complete the remainder of the contract without access to BEM's proprietary source code, which was merely licensed to the state under the contract and would not be accessible to

---

[3] After our decision in *Delasoft*, this court also declined to apply *Meccon* to a case involving a disappointed bidder that had been denied a municipal vehicle towing contract. *Speed Way Transp., L.L.C. v. Gahanna*, 10th Dist. No. 20AP-239, 2021-Ohio-4455, ¶ 37-38. Under the facts in that case, the court also noted that even if *Meccon* applied, the disappointed bidder would not be eligible to recover bid-preparation damages because it did not promptly seek injunctive relief. *Id.* at ¶ 38.

Delasoft. Therefore, the court concluded Delasoft could not complete the remainder of the contract without duplicating BEM's prior efforts. The trial court concluded that, under a *Meccon* analysis, Delasoft's claims for declaratory judgment and injunctive relief were moot because performance of the contract commenced before Delasoft filed suit. We review that conclusion de novo.

{¶ 19} Our prior decision noted that the key factor in the *Meccon*-type cases was whether "one task substantially builds on what has been done before and in which a shift of providers inevitably would burden taxpayers with significant extra cost beyond the costs associated with any one bid." *Delasoft* at ¶ 31.

{¶ 20} At the hearing on remand, Kevin Courtney, director of BEM's software business unit, described the process involved in configuring its system to meet ODOT's requirements:

> So the first step that we go through is what we call our requirements gathering phase and that's where we meet with the customer. We understand exactly what the customer's requirements are, and that would include the number of permits that they have, the work flows that they have, the roles that they have within their organization, and we built this platform so that it is -- we call it "data driven." That means that you don't have to make software customizations, but rather you go out and you make configuration changes. We, also, at that -- during the requirements gathering, we understand if there are other systems that we need to integrate into.
>
> * * *
>
> [S]o we gather all of that information. We generally will come back with a deliverable that's a design deliverable, and it will describe any changes that we make to the screens, the system. And then it will describe the work flows from end to end so that the customer can then look at it and say, Oh, here's my RFP requirements. And then this is the manifestation of what I'm going to get. And then they can say, We approve that. We sign off on it, and then, please, go out and configure it. The configuration process -- so that process might last anywhere from one to three months, depending on the speed that the customer can operate at, as well as the size of the project and how many systems there are.
>
> Once that -- once that's completed, then we can move forward with the development activities, which include configuring the software to meet those requirements. Then we go through

several rounds of internal testing. We go through what we call "initial unit testing." It's where we make sure all the pieces work from our configuration and developers. Then after we do that, then we go through something called "quality assurance testing." That's to make sure when the developers said it would work, that it really does work. Then we go through what we call "end-to-end testing," or user-acceptance testing, or systems testing, there's lots of different names. That's where we actually -- that's where we actually ensure that the system does meaningful, viable work and that it meets the customer's needs.

After we complete our testing phase, then we work with the customer to set up what we call "user-acceptance testing."

* * *

At the end of that process, and throughout that process, there may be some items that are identified. If there are bugs or problems, we fix them. If there are requests for enhancement or additional functionality, we note them and then they'll go on to some enhancement list going on into the future. And then we bring that to closure. And then we request to the customer that they sign off on that. And then that deliverable becomes complete. There may be some documents that go along with that.

Then we move into the final stage, which is we go through training. And, again, there's a training planning process. Then there's a training execution process. And then there's some post-training time where we support -- where we support the users.

(Mar. 16, 2021 Tr. at 234-38.)

{¶ 21} The progressive nature of the work Courtney described is also reflected in the way the "deliverable" tasks under the contract were designated and in the invoices BEM submitted to ODOT. Courtney testified that by August or September 2019, Delasoft had "completed all of the requirements that we were headstrong into — into configuration, development, and testing" and that around 3,000 hours had been put into the project by that time. (Mar. 16, 2021 Tr. at 241.) Similarly, Wendi Snyder, the statewide utilities and program manager in ODOT's office of real estate, who managed the right-of-way permit process, testified "[t]here's a lot of configuration that had to be done for [ODOT] because there's 15 different types of permits." (Mar. 16, 2021 Tr. at 31.) Snyder estimated ODOT employees had spent "200 to 500" hours consulting with BEM by the time Delasoft filed

suit. (Mar. 16, 2021 Tr. at 118.) As of July 2019, BEM had completed the first task of the project and ODOT had approved payment of that invoice in August 2019.

{¶ 22} This evidence indicates that BEM began with "off-the-shelf" software, but the discovery, design, development, and implementation processes to adapt that software to ODOT's requirements were analogous to a construction-type project, with one task substantially building on the prior tasks, and where a shift in providers would involve significant additional burden. Although the parties agree it was a goods-and-services contract, the software system in this case was different from the fuel oil in *Griffin*, the multi-function printers in *Modern Office Methods*, or the towing services in *Speed Way*.

{¶ 23} Delasoft argues its claims should not have been deemed moot because at the time the complaint was filed BEM had only completed the discovery phase, which constituted four percent of the contract. However, the cost of the discovery phase constituted almost ten percent of the "deliverable" tasks under the contract. Courtney also testified that BEM was proceeding with other phases of the project at the time Delasoft filed suit. The *Meccon* decision stated that under the Supreme Court of Ohio's precedent, "once the public-improvement work commences or is completed, the rejected bidder will not be able to perform the public contract even if the bidder demonstrates that its bid was wrongfully rejected." *Meccon* at ¶ 12. The *Meccon* decision specifically referred to the point at which work "commences," not once some minimum threshold of work had been completed.

{¶ 24} Delasoft also argues the trial court erred by concluding it could not provide continuing service and maintenance under the contract renewals because the software was proprietary. Delasoft argues that, under the contract arising from the RFP, the state owns the source code for the software used in the program, citing a provision of the RFP stating that the state owns all custom work produced under the RFP. Appellees argue BEM's source code is proprietary and assert that the state does not own the source code under the contract.

{¶ 25} The trial court considered ownership of the source code in the context of determining whether Delasoft could be substituted for BEM and complete the remaining portions of the contract. Notably, Delasoft's original complaint and amended complaints did not request that the contract be awarded to it. Rather, Delasoft's original complaint

requested an injunction prohibiting the award of the contract and the amended complaints requested termination of the contract and prohibition of continued performance.[4]  Despite Delasoft not requesting such relief, when considering whether the *Meccon* analysis should be applied, our prior decision raised the question of whether Delasoft could be substituted for BEM during the contract renewal period.  *See Delasoft* at ¶ 38 ("In short, the extent to which another provider could step in without the additional burden to the taxpaying public forestalled by the construction-like, hard to unwind, 'public improvement' contracts line of cases (if, for example, a contemplated contract renewal for 2021, or 2023, or 2025, or 2027 were sought to be enjoined as arising from an illegal initial contract) is not readily apparent from the record as presented to us.").  Thus, in considering this question, the trial court was considering an issue raised in our prior decision.

{¶ 26} The relevant clauses in the RFP relating to ownership provided that the state owns all "custom work" produced or developed under the contract resulting from the RFP, including any "software modifications, customizations, extensions, integrations, interfaces, and documentation."  (Req. for Proposal at 37, Ex. A to Compl.)  The RFP further provided that "[f]or custom work that include custom materials such as software, scripts, or similar computer instructions developed for the State, the State is entitled to the source material."  (Req. for Proposal at 38, Ex. A to Compl.)

{¶ 27} Another provision of the RFP addressed "commercial material," which was defined in relevant part as "anything that the Contractor or a third party has developed at private expense, is commercially available in the marketplace, subject to intellectual property rights, and readily copied through duplication."  (Req. for Proposal at 38, Ex. A to Compl.)  The RFP further provided that for "commercial software," defined as commercial material that was software, the state would have certain specified rights, including the right to use, copy, modify, adapt, or combine the software with other software.  (Req. for Proposal at 38-39, Ex. A to Compl.)  In its written closing statement, ODAS asserted that BEM's source code fell under the "commercial software" clause of the RFP and, therefore, the state did not own the software but instead had limited rights to use it.

---

[4] In its brief on appeal, Delasoft reiterated that it "never demanded award of the contract in its prayer for relief."  (Appellant's Brief at 25.)

{¶ 28} Courtney testified that BEM's software platform, referred to as PAECETrak, was commercial off-the-shelf software that had been developed over a period of 15 years at an estimated cost of $5 to $7 million. He explained that within the platform, BEM did not make software customizations, "but rather you go out and you make configuration changes" to meet the needs of customers. (Mar. 16, 2021 Tr. at 235.) On cross-examination, Courtney testified about ownership of the work BEM had performed under the contract with ODAS:

> Q. Who owns the work that BEM did for the State?
>
> A. It says that the State owns all custom software -- all custom work. We provide a software platform that we configure. So we are not making custom software. We run one piece of software across the footprint of all of our customers and we are able to configure it. Except I will -- limited to software modifications, customizations, extensions, integrations. We have integrated into ODOT's MyODOT system. We have integrated into ODOT's payment gateway system.

(Mar. 16, 2021 Tr. at 275-76.) Courtney denied that BEM wrote unique customized software for the ODOT project, testifying "we don't customize. We configure." (Mar. 16, 2021 Tr. at 277.)

{¶ 29} Delasoft's executive vice president, Jay West, testified that BEM's source code would not be needed for Delasoft to assume internet hosting of ODOT's online permit system. When asked whether Delasoft would need access to BEM's source code to conduct support and maintenance under the contract renewals, however, West admitted "[y]ou would need to know the software on that and be able to fix when they arise or do any feature enhancement down the road." (Mar. 18, 2021 Tr. at 324.) West testified Delasoft would be capable of upgrading the ODOT system "[i]f we had the proper software." (Mar. 18, 2021 Tr. at 325.)

{¶ 30} Based on the evidence presented at the hearing, we cannot conclude the trial court erred by finding that the BEM software was proprietary and not owned by the state, as part of the trial court's larger analysis of whether *Meccon* should be applied to Delasoft's claims for injunctive relief.

{¶ 31} Appellees have established that development of the online permitting system for ODOT was a situation where "one task substantially builds on what has been done before and in which a shift of providers inevitably would burden taxpayers with significant

extra cost beyond the costs associated with any one bid." *Delasoft* at ¶ 31. Therefore, notwithstanding the fact that this was a goods-and-services contract, on the facts of this case the trial court did not err by applying *Meccon* and concluding that Delasoft's claims for declaratory judgment and injunctive relief were moot because performance under the contract commenced before Delasoft sought relief. Contrary to Delasoft's claims, however, we do not conclude that *Meccon* would apply to all goods-and-services contracts and our conclusion is limited to the specific circumstances in this case.

**{¶ 32}** Accordingly, we overrule Delasoft's first assignment of error.

### B. Whether Delasoft's claims were capable of repetition, yet evading review

**{¶ 33}** In its second assignment of error, Delasoft asserts the trial court erred by dismissing its injunctive relief claims as moot because the claims are capable of repetition yet evading review.

**{¶ 34}** "The 'capable of repetition, yet evading review' doctrine is an exception to the general rule against deciding moot issues that applies when (1) the challenged action is too short in duration to be fully litigated before its expiration, and (2) there is a reasonable expectation that the complaining party will be subjected to the same action in the future.*" Munroe Falls v. Chief, Div. of Mineral Resources Mgt.*, 10th Dist. No. 10AP-66, 2010-Ohio-4439, ¶ 6. "[T]he capable-of-repetition doctrine applies only in exceptional circumstances." *State v. Jama*, 10th Dist. No. 17AP-569, 2018-Ohio-1274, ¶ 10.

**{¶ 35}** This court previously declined to apply the capable-of-repetition doctrine in a construction case appeal that was rendered moot because the disappointed bidder failed to obtain a stay of execution of the trial court's judgment or an injunction pending appeal. *TP Mechanical Contractors, Inc. v. Franklin Cty. Bd. of Commrs.*, 10th Dist. No. 08AP-108, 2008-Ohio-6824, ¶ 20. In that case, the disappointed bidder had been rejected because the county commissioners determined it did not satisfy quality contracting standards related to compliance with prevailing wage laws. *Id*. at ¶ 10. The disappointed bidder argued its appeal should not be dismissed as moot because there was a reasonable probability it would be subjected to the same actions and effectively eliminated from bidding on future county contracts. *Id*. at ¶ 21. This court noted that "even if [the disappointed bidder] is subjected to the same actions on a future bid, it would not necessarily be precluded from obtaining review of these same issues, as long as a timely

stay of execution or injunction pending appeal is obtained." *Id.* at ¶ 22. *See also State ex rel. Grendell v. Geauga Cty. Bd. of Commrs.*, __Ohio St.3d__, 2022-Ohio-2833, ¶ 13 ("Judge Grendell cannot meet the first prong of the [capable-of-repetition] test because, were the county to fail to process one of his future appointment applications, he would have time to seek judicial review."); *State ex rel. Burkons v. Beachwood*, __Ohio St.3d__, 2022-Ohio-748, ¶ 17 ("Burkons cannot satisfy the first prong of the [capable-of-repetition] test: if he were to be the target of a future prosecution by Scalise, he would have time to seek judicial review.").

{¶ 36} Delasoft argues use of the MBE program as part of the scoring of the RFP was unconstitutional and that if its claims are deemed moot because performance of the contract had commenced before it filed suit, this same scenario could occur again if the MBE program is incorporated into other requests for proposals. As in *TP Mechanical*, however, Delasoft would not necessarily be precluded from challenging the constitutionality of a similar request for proposal in a future case if it timely sought injunctive relief before performance under the contract commenced. In this case, the MBE subcontractor component was set forth in the RFP; therefore, Delasoft was on notice of the allegedly unconstitutional scoring system *before* submitting its bid. Delasoft was notified on February 5, 2019, that BEM had been awarded the contract but waited nearly two months before filing a protest with ODAS and nearly six months before filing a lawsuit seeking injunctive relief. In the meantime, the project kickoff meeting between ODOT and BEM was held on February 14, 2019, and, by July 2019, BEM had completed the first deliverable task of the project and was proceeding with other tasks.[5] Under these circumstances, because Delasoft was aware of the allegedly unconstitutional scoring component before submitting its bid but waited nearly six months after learning it had not been awarded the contract to seek injunctive relief, Delasoft fails to establish that the capable-of-repetition exception to the mootness doctrine applies to this case.

---

[5] We further note that Delasoft failed to seek a stay of the trial court's ruling pending its prior appeal. Generally, in construction-related cases, if an unsuccessful bidder seeks to enjoin construction but fails to obtain a stay pending judicial resolution of its claims and construction commences, the action will be dismissed as moot. *See State ex rel. Gaylor, Inc. v. Goodenow*, 125 Ohio St.3d 407, 2010-Ohio-1844, ¶ 11; *TP Mechanical* at ¶ 20. Although Delasoft disputed whether the contract in this case should be analogized to a construction contract, it was clear that the trial court had applied the *Meccon* analysis and yet Delasoft failed to seek a stay pending appeal. Thus, work under the contract continued during the pendency of the prior appeal.

{¶ 37} Accordingly, we overrule Delasoft's second assignment of error.

**C. Whether the trial court erred by dismissing Delasoft's Section 1983 claims**

{¶ 38} In its third assignment of error, Delasoft argues the trial court erred by dismissing its Section 1983 claim. Delasoft asserts its complaint, which alleged that the employees involved in the RFP process acted under the direct supervision and control of Marchbanks or Damschroder, was sufficient under the notice pleading standard to state a claim for relief. Appellees argue Delasoft failed to allege any direct involvement by Damschroder or Marchbanks in development of the RFP or scoring of the submitted proposals. Moreover, appellees claim Damschroder and Marchbanks had no direct personal involvement in development of the RFP or scoring of the submitted proposals because those events occurred before they assumed office. Appellees argue Damschroder's involvement was limited to signing the contract, which previously had been signed by BEM, on his first day in office. Delasoft claims that signing the contract was sufficient for Damschroder to be liable under Section 1983.

{¶ 39} "Section 1983 will not support a claim based on a respondeat superior theory of liability." *Polk Cty. v. Dodson*, 454 U.S. 312, 325 (1981). *See also Boler v. Early*, 865 F.3d 391, 417 (6th Cir.2017) (citing *Dodson*); *Kinney v. Ohio Dept. of Admin. Servs.*, 30 Ohio App.3d 121, 122 (10th Dist.1986) ("[T]he theory of respondeat superior is not applicable in Section 1983 actions."). "[T]he liability of supervisory personnel must be based upon more than the mere right to control employees." *Kinney* at 122. " 'There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it.' " *Doe v. Claiborne Cty.*, 103 F.3d 495, 511 (6th Cir.1996), quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.1984). *See also Sexton v. Cernuto*, 18 F.4th 177, 185 (6th Cir.2021) (citing *Doe*).

{¶ 40} In the second amended complaint, Delasoft alleged that "all public employees involved in the preparation, review, and decisions for the RFP and Work at issue acted pursuant to the direct supervision and control of" Damschroder or Marchbanks. (Second Am. Compl. at ¶ 69.) The second amended complaint alleged the "improper, discriminatory, and unconstitutional use of the MBE Program as applied" violated Delasoft's civil rights. (Second Am. Compl. at ¶ 70.) The second amended complaint further alleged Damschroder and Marchbanks knew the MBE program was

unconstitutional and failed to consider a race-neutral alternative to the MBE program. Beyond these general allegations, however, the complaint did not assert any direct participation by Damschroder or Marchbanks in the creation or scoring of the RFP. Thus, the second amended complaint failed to allege any encouragement or direct participation in the alleged denial of civil rights by Damschroder or Marchbanks. Presuming the allegations in the second amended complaint to be true, at most the complaint would establish that Damschroder or Marchbanks supervised or controlled the employees who created and scored the RFP. That is insufficient to establish liability under Section 1983. *See, e.g., Broyles v. Corr. Med. Servs.*, 478 Fed. Appx. 971, 977 (6th Cir.2012) (holding that general allegations of failure to supervise and train employees were insufficient to establish Section 1983 liability). *Compare Boler* at 417 (declining to dismiss Section 1983 claims against former directors and supervisors because the plaintiffs' allegations concerned the directors individual conduct and participation in alleged violations of the plaintiffs' due process rights).

{¶ 41} Accordingly, we overrule Delasoft's third assignment of error.

## V. CONCLUSION

{¶ 42} For the foregoing reasons, we overrule Delasoft's three assignments of error and affirm the judgments of the Franklin County Court of Common Pleas.

*Judgments affirmed.*

KLATT and McGRATH, JJ., concur.

————————————